And we'll move to our second case this morning, CFPB v. Townstone Financial. And we have Mr. Sandberg remotely today, but we're just waiting for a little change in the chairs here in the courtroom, so stand by for just a moment. All right, looks like everyone's in place. Mr. Sandberg for CFPB, you may proceed. May it please the Court. Justin Sandberg on behalf of the Consumer Financial Protection Bureau. For nearly 50 years, Regulation B has operated in conjunction with the Equal Credit Opportunity Act to protect prospective applicants for credit from discrimination in the form of discouragement on a prohibited basis. This common-sense measure prevents creditors from adorning their offices with whites-only signs and engaging in other forms of discouraging behavior. The District Court, applying the Chevron framework, concluded that ECOA does not authorize the protection of prospective applicants. The District Court erred. Congress has spoken clearly. Discriminatory discouragement is unlawful, and the Bureau has the authority to prohibit it. In any case, the Bureau's interpretation of ECOA is reasonable. The District Court's judgment should be reversed. I'll focus my presentation on the statutory question before turning to the constitutional arguments that defendants raised briefly in their opposition brief. First, on the statutory question. As I noted at the outset, Congress has spoken clearly. And there's two statutory provisions that evict Congress's intent with respect to discriminatory discouragement. The first is the delegation of regulatory authority, and the second is what we've been calling the referral provision. Perhaps we could start with the text of the scope of prohibition and the statutory prescription against activities constituting discrimination in this context. That's the appropriate focus, not the delegation of authority to the agency. I'm trying to situate your argument in the context of Chevron, and that would ordinarily, in an ordinary Chevron case, be the starting point. Has Congress unambiguously or ambiguously spoken to this question, if it's ambiguous? And the question being whether prospective applicants are covered within the scope of the statute. If it's ambiguous, then we know what to do under Chevron. If it's unambiguous that prospective applicants are not covered in the prohibitory language or in the class that's protected here, then the agency has no authority. Your Honor, under Chevron, you should start with the text of the statute as a whole. And so the text of the statute is not exhausted by the applicant provision. The text of the statute includes delegation of regulatory and referral provision. And as we explained in our brief, the delegation of regulatory authority essentially says, you know, agency, here are the loopholes. You're authorized to plug loopholes in the statute in order to prevent circumvention and evasion of the statute. And what the referral provision says is essentially it endorses the sort of plugging of this loophole by the board, which initially did it, and then essentially nudges the Bureau and says, you know, this is a loophole that you should be plugging. And we think that the district court erred in reading the applicant provision as sort of a hard fence around these provisions. If one looks at the Mourning case, one sees similar delegatory language. That's the case in which the Supreme Court interpreted TILA. And it had similar circumvention and evasion language. But the Mourning case predates Chevron, which provides the analytical framework for this case. And so I don't know if it allows us to circumvent our instructions in Chevron, however much longer they may be with us. Yes, Your Honor, we're not asking the court to circumvent Chevron. We believe Chevron is the applicable framework. We're not citing Mourning for that framework. What we're citing Mourning for is essentially a legal historical fact about what this kind of delegatory language means. And what the Supreme Court said in TILA was the circumvention and evasion language meant that the Federal Reserve Board could issue a regulation requiring disclosures related to what they called four payments, things that involved payments but didn't specifically involve a finance charge, even though the statute itself discussed finance charges. And what the court said was through the circumvention and evasion language, Congress gave the board, in that case, the authority to plug that kind of loophole. And the same thing is true here. The circumvention and evasion language enables the Bureau to step in and stop discouragement of prospective applicants because that evades the purposes of the statute, which is equal credit opportunity. But the language in the delegation provision pertaining to the agency's rulemaking authority doesn't authorize the agency broadly to engage in rulemaking to prevent circumvention or evasion. That language of the primary prohibitory provision of the statute, that language is tethered to the preceding language in the delegation, which is related to the agency's authority to provide such adjustments and exceptions for any class of transactions, as in the judgment of the Bureau, are necessary or proper to effectuate the purposes of this subchapter or to prevent the circumvention or evasion thereof. So the agency is authorized to make adjustments and exceptions to a class of transactions to prevent circumvention or evasion of the statutory non-discrimination norm. But the statutory, it doesn't permit the agency to expand the non-discrimination statutory provision. Your Honor, I think we might be reading that a little differently than you do. How we read it, and I believe how Mourning reads it, is that the circumvention and evasion language gives Mourning the Board and here the Bureau the authority to prevent conduct that would circumvent or undermine the underlying purpose. But the Mourning case had to do with a classification of transactions under TILA. Your theory does not. Your theory of the scope of the agency's rulemaking power is that anything the agency thinks is necessary or proper to prevent circumvention or evasion of the non-discrimination norm or non-discrimination provision in the statute is within your agency's authority to regulate. That's not what the delegation provision says. And Mourning's interpretation and application of the delegation provision had to do with a specific regulation that was operating on a class of transactions, unlike this case. This case isn't operating on a class of transactions at all. It's operating on a podcast. Well, Your Honor, what Mourning gave— You're trying to bring a podcast within the scope of the non-discrimination norm, assuming that anybody who heard—or on the premise that anybody who heard the podcast or the radio show within the reaches of the AM radio station that it appeared on was discriminated against as a potential applicant for credit. That's an extraordinarily broad theory. So, Your Honor, I'd push back on that. I don't think it's an extraordinarily broad theory. I think the dimension financial case shows that there are boundaries, and we don't deny that there are boundaries. And I would also push back on the notion that Mourning was somehow indifferent in kind. What Mourning did was it said the statute basically says cases with finance charges require disclosures, and it allowed the board in that case to say, well, you know, we'll consider four payments to also require the disclosure. So I don't think it's different in kind here, Your Honor. And as to the radio show and podcast, I don't think it's— there's nothing extraordinary about saying that a radio show directed towards prospective applicants. Presumably that's why they have this infomercial commercial. They're trying to get prospective clients. To say that it's within the Bureau's authority to prevent—prohibit discouragement in that context, it would be sort of akin to saying, you know, some folks who see a whites-only sign hanging outside the door might not be prospective applicants. So that wouldn't mean, therefore, that they couldn't hang up the white-only sign. It would just mean some people aren't prospective applicants. But there's still a valid reason to prohibit the hanging of those signs, and that's because those signs, even if they reach some people who aren't prospective applicants, certainly reach a core group of people who are, and therefore evade the purposes of the statute by discouraging applicants. The civil liability provision of the statute is limited to aggrieved applicants. Don't we have to read the primary prohibition of the statute, the nondiscrimination norm in the context of the civil liability provision in the statute? I understand that the agency has independent authority to litigate. I get that. But you're seeking a whole host of remedies, including damages, on this potential applicant theory, which would seem to sweep in anybody who heard this series of radio broadcasts or the podcasts and would be a potential applicant at any point in time during whatever period the statute of limitations applies. So as Your Honor pointed out, the aggrieved applicant is limited to individuals seeking to sue. And we're not saying that it applies to sort of the fact that anyone might have heard it. It's that prospective applicants might have heard it. Do you know of any prospective applicants who might have heard this and were dissuaded from applying for credit from this nonbank entity? I'm not quite sure what to call it. It's a nonbank previously a mortgage provider and now just a mortgage broker, if I'm understanding correctly. I think that's right. I mean, three things on that, Your Honor. One is that the statute doesn't require us to identify individuals. The second thing would be. How are you going to prove your case if this moves forward for purposes of all the broad remedies you're seeking? So a couple. Yeah, certainly, Your Honor. And that's another point was there's no factual record yet. This came to the court on a motion to dismiss. So we don't have a factual record. But we did allege that there was basically a disparity in the number of applicants. Okay, that's a statistical disparate impact kind of a theory. We're talking about disparate treatment statute. This is a disparate treatment. You've got to identify some victims. Your Honor, we don't under the statute. And it is a disparate treatment case. We're not saying otherwise. But Your Honor was asking if we have. You can't have a disparate treatment case by reference to the statistical number. Statistics about what minority populations live in the neighborhoods that the broadcasters were disparaging. That's the other problem with this case. The broadcasters were disparaging neighborhoods. They weren't disparaging people. But that's a separate question. There isn't a traditional motion to dismiss based on insufficiency of the factual allegations here. This is an admin law case. Your Honor, the disparate treatment, this is a disparate treatment case. And what the factual disparities go to show is that the statements, the discriminatory statements actually had effect. Your Honor asked if there was any sort of evidence they had effect. And what the sort of shortfall in lending shows, it's not, it shows that those statements, in fact, are discouraging. We think even if we can't point to specific applicants, which we don't need to do, I would like to reserve the remainder of my time. May I take a moment, please? Oh, please. Because what do you think of the limiting principles that were suggested by the Mortgage Bankers Associations and others in that amicus brief? That first, the Bureau must plead and prove that the statements made by the lender affirmatively discouraged applications on a prohibited basis. And second, that the Bureau must plead and prove that the statements caused identifiable applicants or prospective applicants to be discouraged from applying. Yes, Your Honor. On the, and I'm trying to do my best to remember what they meant, on the affirmative discouraged point. I can tell you where they are, Derek Page. Yes. Yeah. Yeah.  I apologize, Your Honor. No, I apologize. Go ahead. On the affirmatively discouraging point, I think there, the difficulty is, is I think they're reading in a limit that's not there, and it would therefore sort of allow for dog whistles. I think under their theory, if you had a discriminatory dog whistle, something that it's on its face wasn't discouraging, but factual evidence would demonstrate was, in fact, discouraging to folks, that their standard would allow that. And I don't think that's at all consistent with what the regulation says or what it should say. And the second point on identifiable applicants, you know, that's, I think that's, that's not the standard, and I think for good reason. It can be difficult to identify, identify people who have been discouraged. And there's no indication that Congress, you know, required any such thing. In its legislative history, it cited approvingly to the fact that Regulation B applies to discriminatory advertisements. And obviously, in cases involving advertisement, you have discouragement, and it can be hard to identify who specifically was discouraged. If I may reserve whatever time I have left. I appreciate it. That's fine. I'll give you some more time. Thank you, Your Honor. Thank you. All right. Mr. Simpson. Thank you, Your Honor. And may it please the Court, Steve Simpson from the Pacific Legal Foundation for Appellees, Townstone, and Mr. Barry Sterner. Your Honor, I'd like to start off with a comment that my friend on the other side made right at the end of his argument, and just point out something that I think needs to be made clear, and I think Your Honor was perhaps focusing a bit on this. ECOA does not prevent discriminatory dog whistling. Whatever discriminatory dog whistling might be, Your Honor, as I understand it, it would be something like sending codes to people and preventing them from taking actions that they have a right to, Your Honor. Whatever that may mean now, we are so far beyond the language of ECOA. ECOA prevents discrimination against applicants in the context of a credit transaction. It does not prevent statements that may even disparage people, statements that might offend people, statements that characterize a neighborhood in a way that somebody might find offensive. It does not prevent any of those things, Your Honor. And the CFPB's argument ultimately amounts to we can rewrite ECOA in any way we wish to reach anything we think might in some way offend or discourage somebody from making an application under ECOA. That is definitely not what Congress did. There is nothing in this law that even hints that Congress went anywhere near such a construction. Your Honor, I'd like to focus a little bit on the discussions in Mr. Sandberg's presentation with respect to the delegation provision and the mourning decision. The delegation provision, Your Honor, is not a loophole closing provision, or it does not in any way give authority to CFPB to, quote, close loopholes. And I'm not sure what that would be, Your Honor, but if there were such a delegation provision, I think Congress would have to be crystal clear about what sort of authority it was delegating to the CFPB or to the enforcing agencies to, quote, close loopholes. And Your Honor, I'll point to the Dimension Financial case, which my friend on the other side referred to. That's the Board of Governors versus Dimension Financial. The court covered exactly this type of an argument. In that case, the Fed tried to redefine the definition or reinterpret the definition of banks under the Bank Holding Act. And the argument that the Fed made was the way banks have created new types of entities that can issue now accounts, this is the functional equivalent of banks under the Bank Holding Act, and therefore we can broaden the definition of banks under that law. And the Supreme Court said, no, you don't have the authority to do that. And in footnote 5 of that decision, it explicitly referred to the delegation provision in the Bank Holding Company Act, which was very similar to the provision here. It talked about carrying out the purposes of the act and, among other things, to prevent evasion of the act. And what the Supreme Court said was that language gives the agency the authority to police within the boundaries of the act. So, Your Honor, Judge Sykes, I think you focusing on 1691 as the scope of prohibition is both the appropriate place to look, because that is where Congress laid out the fundamental liability provision in ECOA. That's what Congress spelled out as what a creditor may or may not do, and what they may not do is discriminate against applicants. And that's the logical starting point. That's precisely what the Supreme Court did in the Dimension Financial case. It even went as far, Your Honor, as to say sometimes statutory construction will lead to anomalies, and those anomalies, if they exist, are Congress's to fix, not the agency. And a number of cases have pointed that out, Your Honor. Oh, I'm sorry. Sure. Forgive me. On page 6 of your brief, you say that the hypothetical whites-only sign would announce a practice of violating Section 1691A. But what if the lender whose defense is, sure, we have that sign, but if a minority actually applies, we don't treat them any differently and we have hard evidence to prove that. What is the enforcement mechanism for that conduct? Your Honor, if it's a lender, the first enforcement mechanism would be it's an obvious violation of FHA. So there are other statutes that actually cover that. That would be a violation of FHA, and FHA is both written broader than ECOA and has a specific provision, 3604C, I believe it is. We cite it in our brief, and CFPB cites it in their brief. So, I mean, that would be one thing. It would be an obvious violation of other laws. But, Your Honor, let me try to – well, and I'll say a couple other things about that. It would also be a violation of Illinois law. Illinois Human Rights Act would ban precisely the same thing. So the notion that any lender, creditor of any sort, could get away with posting a white applicants-only sign is a hypothetical, and we believe a fanciful hypothetical, especially in a world in which DOJ would investigate them, and CFPB, which has supervisory authority over these entities, means they can investigate. What, for instance, if, you know, this one isn't covered by the FHA? Sure. I mean, I hear you kind of saying that there are all sorts of things. We don't need the CFPB. I mean, you know, if you go all the way through the arguments, I fear that that's where you're going. And what I worry about is, in this case, that an affirmance might possibly lead to unequal rules for banks and lenders supervised by the CFPB compared to those supervised by other regulators like the FDIC. Your Honor, I think the answer is ultimately it could. So to try to get to what I think the nub of your question is, is could a creditor in some circumstance post a white applicants-only sign and get away with it? What I think, Your Honor, is yes, they could get away with it for a very short amount of time for all the reasons that I said. And I don't think that any creditor, I mean, as a practical matter, Your Honor, it would take an insane creditor to do such a thing, given the nature of investigations by DOJ and by CFPB. And as the Mortgage Bankers Association points out in their amicus brief, there's no creditor that they know of that is going to do such a thing. But yes, it can happen. There are all sorts of dog whistles and other behavior that we see. Yes, Your Honor. And if that's the case, it's for Congress to fix. That's the ultimate answer, Your Honor. And that was the answer in many other cases. Dimension Financial is, I think, the case most closely on point. Police within the bounds of the act. And if there is some anomaly that results from interpreting the actual words of the law, that is ultimately for Congress to fix. That's both in the Dimension Financial case, Your Honor, and more recently, the SAS versus Ioncu case, which is a patent case. Justice Gorsuch, writing for the majority, made the point that if there are problems with a statutory scheme, it is for Congress to fix, not for an agency to simply assume they have the power to, quote, fill loopholes. And, Your Honor, especially in a context like this, where the CFPB is necessarily dealing with speech. I mean, we should remember that the statements at issue in this case are not in the same universe as a white applicants only sign. So, Your Honor, I think the proper way to think about it is, could, hypothetically, a mortgage broker or some creditor, wouldn't be a mortgage broker because they're covered by FHA. Could, hypothetically, some crazy creditor post a white applicants only sign and get away with it? And my answer is, ultimately, at some point, yes, I think they can get away with some short amount of time until the Illinois Human Rights Commission comes after them and prosecutes them. There. That weighed against the certainty, Your Honor, the certainty that CFPB will be going after speech that is obviously protected under the First Amendment. I say certainty, Your Honor, because it is actually happening in this case. And I think that if CFPB, sorry, go ahead. I think you can, I think you can help me with something. Sure. When I read your free speech argument, according, well, it seemed to me that you were saying that the holding in the 303 creative case would actually allow a lender to paper the south side of Chicago with flyers that say black people should not apply for credit with Townstone as long as the lender did not actually discriminate against non-whites once they submitted an application. Even after, of course, being told it's a useless act. Now, is that your argument or am I just, you know, totally wrong? No, Your Honor, I don't think under, I don't think the holding of 303 creative would lead to that result, Your Honor. And the reason is this, and this goes beyond just the 303 creative case, under, so our argument is that, not that Congress couldn't add constitutionally a provision to a COA that said that creditors can't make statements that indicate discriminatory intent, which is essentially what the provision under FHA says. But in order to do that, in order to go after speech like that, it would have to be targeted to what it is that Congress has already made illegal. And that's a general principle of the First Amendment. There are certain types of speech that are incidental to crimes or other things that Congress or the states have made illegal. And the government can prohibit that because it is part of the same transaction. It is part of a transaction that can otherwise be regulated. And there are some cases that deal with that. Now, Your Honor, all the cases I think that CFPB relies on other than the Reagan case out of the Second Circuit, and I can discuss that if you like, Your Honor, all of them involve individuals. So we have individuals before the court that are saying this statement, you know, is a statement of discriminatory intent, not a kind of roving commission to outlaw any speech that an agency thinks might discourage somebody from applying. That I think is far too broad. And that's not just the 303 creative case. But in your analysis, aren't we basically rewarding, you know, the lenders who are more successful at discriminating? In other words, those who can prevent minorities and women from even applying? I don't see why that would be, Your Honor. I mean, I think that the comparable provision in FHA properly cabined to take into consideration what the court said most recently in Kahneman v. Colorado. That might have some impact on the comparable provision of FHA. But I don't read 303 creative to say that that type of a provision is unconstitutional. Now, if that's what the court in 303 creative said, I don't think it is, then that would be the constitutional rule. And I don't think there's anything that this court or the CFPB has to say about that. That would just be what's constitutional. But I don't think that's true. I don't read 303 creative as doing that. But it's important to remember, Your Honor, that is not. I don't understand why 303 creative has an application here. You know, this isn't a creative expressive work of an artist. And we're talking about loan applications. That's true, Your Honor. Well, what we're talking about is statements on a radio show. We're not talking about loan applications. That's, in fact, not what we're talking about. It is clear that. Let's take a look at the broader view here. I think we are talking about loan applications via some podcast on a radio show. Well, Your Honor, I just don't think that, I mean, if it were loan applications, if it were an individual applying for credit, then the plain terms of ECOA would reach that. But, Your Honor, the takeaway from 303, well, let me actually try to address your point in the time I have left on what I think you're getting at is, isn't this just commercial speech? And doesn't that change things if it's in something like an advertisement? And the answer is no, Your Honor. Sure. So the answer is no, Your Honor. And the cases on point are the RAV versus City of St. Paul, which made clear, and at one point in the decision, the majority said that even though the state can regulate commercial speech, it couldn't regulate speech that demeans men, was the example it gave. And the whole backdrop or the whole point of RAV was, even in certain circumstances in which government can ban or regulate certain kinds of speech, it cannot engage in viewpoint discrimination. So that's one reason, Your Honor. And there are many cases that point that out. Mattel versus Tam and Iancu versus Brunetti. The Wandering Dago case out of the Second Circuit affirms that basic point. So there are many cases that make that point. Your Honor, the final thing I would say, and I know I'm out of time, so if I could just very briefly say that in addition, Your Honor, Riley versus National Federation of the Blind made the point that if speech, commercial aspects of speech and non-commercial are inextricably intertwined, and later on other cases expounded on this, and made the point that, and the individual speaker, the commercial speaker, has no other means of making their points known or expressing themselves, other than being regulated by the law, that the standard of review would be that for the most protective, the most protective standard of review. I hope I'm being clear about that. That is that what would apply would be something like strict scrutiny. But the constitutional issues here are in the case under the rubric of the constitutional avoidance doctrine. Well, in two ways, Your Honor. I mean, both constitutional avoidance, and we are just making a flat-out challenge to Regulation B as a violation, both facially and as applied, viewpoint discrimination, content-based discrimination, and overbred. Now, we understand the district court did not rule on that. We think the court can, and indeed, based on the threat of the chilling effect that Regulation B and this prosecution or this action against our clients would entail, Your Honor, we think that this is exactly the kind of case that the court should rule on the First Amendment. But, of course, it can simply say we're not going to defer to CFPB because this presents such a First Amendment problem. With that, Your Honor, I'll thank the court. Thank you very much. Mr. Sandberg, your time had expired, but I'll give you back your rebuttal time since we kept you at the virtual podium into your rebuttal time. So you may proceed. Thank you, Your Honor. My friend on the other side has doubled down on the arresting claim that underlies this case, which is that Regulation B has been illegal for 50 years and no one noticed and that it allows whites-only signs, and this is simply not correct. And on the more specific points, my friend on the other side said we're rewriting ECOA, and that's not correct. What we're doing is we're applying all the provisions, and he objected to the notion that this is sort of a loophole plugging measure, but that's, in fact, exactly how Judge Easterbrook in the Century case. It was in dissent, but not on this point. That's exactly how he described TILA and the agency's authority under TILA. He described it as a loophole plugging feature, and there the dispute was about whether the court was doing the plugging, which he thought was wrong. Obviously, that's not an issue here. The second point I would make is I think a lot of the questions have gone to sort of how we would prove the case and what would happen. And obviously, that's a different question from whether we have the authority to issue the rule, any question about sort of what the proof in this specific case would be or whether we could prove it. You know, we believe the case should be remanded, and it can be litigated, and they can try to demonstrate that no one would be discouraged. Obviously, that would be before the district court and on the table. On the speech question, you know, counsel said it's obviously reaching speech protected by the First Amendment, and that's simply not so. As we point out in our brief, sort of a fixed star in the constitutional constellation is that this kind of discriminatory discouragement, whether it be a whites-only sign or other kinds of speech that sort of facilitate unlawful transactions, such in Pittsburgh Press where there were sex discriminatory ads in the paper, that those can be constitutionally prohibited, that it's beyond constitutional doubt that when the speech prohibitions are incidental to a burden on – the burden on speech is incidental, or if the speech is designed to facilitate unlawful conduct such as discriminatory transactions, that there's no constitutional impediment. And I will add specifically on the sort of facial and over-breath claims they raise here. I mean, that's a big problem for their case is, you know, we think they've waived their over-breath and vagueness claims. And even if they hadn't, you know, the cursory fashion they're laid out, they don't make out the claim that the sort of improper applications swamp the proper ones. And on the facial aspect, they certainly don't show that there's no proper application. I think – I think the other side – If we could skip to the as-applied aspect of this in terms of the First Amendment challenge. This speech was – you're trying to apply the regulation and its anti-discouragement rule to a radio show and a podcast that contains some disparaging comments about crime in particular neighborhoods in Chicago. So that – I mean, that stretches the regulation pretty far. But setting that question aside, doesn't that implicate the First Amendment as applied here? So, Your Honor, I'll fight the hypothetical and then move on quickly. We don't think there's an as-applied challenge. But even if one gets to the as-applied question, there is no – you know, there's no First Amendment problem. Obviously, there will be some factual questions, and those could be resolved below. But based on the allegations, which is how the court – this case reaches the court on a motion to dismiss, we've alleged that the radio show is a commercial. It's nothing more than a commercial. And the fact that they have their racially discouraging comments in a long-form commercial is no different than if they had stamped whites only on an ad in the newspaper. Now, they can challenge – Mortgage brokers and mortgage lenders can't say anything about crime rates in Chicago neighborhoods without running afoul of the regulation, the anti-discouragement regulation. So, Your Honor, if you look at the facts as a whole – again, this would have to be litigated below because we don't have a record before the court. They didn't just say something about crime rates. They called a grocery store the Jungle Jewel. They called the Jewel Osco grocery store the Jungle Jewel because it had folks from all over the world. They said when you go through Markham, a predominantly African-American city, you don't lock eyes with anyone. They described a majority African-American area on the south side as hoodlum weekend. Now, again, the court might ultimately determine that these are not discouraging. We don't think that's correct, but that's a factual question to be resolved below. It's not something that can be resolved on the blank record that this court has it on a motion to dismiss. All right. Thank you very much. Our thanks to all counsel. The case is taken under advisement, and the court will take a vote.